UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

JENNIFER PATRICIA LOBBE,                :

                    Plaintiff,          :     17 Civ. 5589 (HBP)

     -against-                          :     OPINION
                                              AND ORDER
NANCY A. BERRYHILL,                     :
Acting Commissioner of
Social Security,                        :

                    Defendant.          :

------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____


PITMAN, United States Magistrate Judge:


I.  Introduction

          Plaintiff brings this action pursuant to section 205(g)
of the Social Security Act (the "Act"), 42 U.S.C. § 405(g),
seeking judicial review of a final decision of the Commissioner
of Social Security ("Commissioner") denying her application for
supplemental security income benefits ("SSI").  Plaintiff and the
Commissioner have both moved for judgment on the pleadings
pursuant to Rule 12(c) of the Federal Rules of Civil Procedure
(Docket Item ("D.I.") 12, 16).  Both parties have consented to my
exercising plenary jurisdiction pursuant to 28 U.S.C. § 636(c).
For the reasons set forth below, plaintiff's motion is granted,
and the Commissioner's motion is denied.

II.  Facts[1]

A.  Procedural Background

Plaintiff filed an application for SSI on May 16, 2013, alleging that she became disabled on January 1, 2012, due to bipolar disorder, posttraumatic stress disorder, anxiety disorder, fibromyalgia and chronic pain syndrome (Tr. 245).  Her application for benefits was initially denied on February 3, 2014, and she requested, and was granted, a hearing before an administrative law judge ("ALJ") (Tr. 21, 91, 16).  On July 21, 2015 and November 24, 2015, plaintiff and her attorney appeared before ALJ Elias Feuer for a hearing at which plaintiff and a vocational expert testified (Tr. 36-82).  On March 14, 2016, the ALJ issued his decision finding that plaintiff was not disabled (Tr. 19-35).  This decision became the final decision of the Commissioner on May 22, 2017 when the Appeals Council denied plaintiff's request for review (Tr. 1-3).  Plaintiff timely commenced this action on July 21, 2017, seeking review of the

_____

[1]I recite only those facts relevant to the resolution of the pending motions.  The administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) sets out plaintiff's social and medical history more fully (Administrative Record, dated Dec. 19, 2017 (D.I. 11) ("Tr.")).

Commissioner's decision (Complaint, dated July 21, 2017 (D.I. 1)).

## B.   Social Background

Plaintiff was born on September 6, 1974 and was 38 years old at the time she applied for SSI (Tr. 211-12). She has an eleventh-grade education (Tr. 246). As of the date of her application, plaintiff lived with her teenage daughter in the Bronx (Tr. 212).

Plaintiff stated in her Disability Report, dated May 16, 2013, that she worked as a waitress in a bar from 2010 to 2012 (Tr. 246). In her "Function Report," plaintiff stated that she had no problems with personal care and that she took her daughter to school (Tr. 253-54). She was able to prepare meals and do light cleaning, although sometimes she needed assistance if her anxiety was too severe (Tr. 254-55). Although plaintiff left her home to take her daughter to school and to pick her up, she was too nervous to drive or to go to crowded places (Tr. 255-56). Plaintiff's leisure activities included reading, doing crossword puzzles and doing her daughter's hair, but she stated that her inability to focus sometimes limited her ability to engage in these activities (Tr. 256).

C.  Medical Background

1.  Medical Records Concerning
Plaintiff's Mental Issues

a.  Dr. Sidiki Dabo

Dr. Sidiki Dabo, a psychiatrist, treated plaintiff from March through July of 2013 and provided a medical source statement for plaintiff dated December 13, 2013 (Tr. 354-64).

At plaintiff's March 5, 2013 appointment, she complained of exhaustion, inability to focus due to anxiety, nightmares and panic attacks (Tr. 363). Dr. Dabo observed that plaintiff appeared mildly distressed and became tearful when telling her life story (Tr. 363). Plaintiff's mood was depressed, anxious and stressed, and she expressed excessive worry, anticipatory fears, anger, worries about possible future problems, obsessions, compulsions and superstitions (Tr. 363). Plaintiff's attitude was cooperative, her awareness, orientation and psychomotor[2] activity were normal, and she did not exhibit abnormal body movements (Tr. 363). Dr. Dabo found her insight and judgment to be fair (Tr. 363).

_____

[2]Psychomotor means "pertaining to motor effects of cerebral or psychic activity." Dorland's Illustrated Medical Dictionary, at 1549 (32nd ed. 2012) ("Dorland's").

In April 2013, plaintiff reported that she was feeling better, with improved sleep, energy level and concentration and decreased appetite and nightmares (Tr. 360). She was hopeful about life and the future and her affect was brighter (Tr. 360). Plaintiff still felt panicky sometimes, but her panic attacks had decreased (Tr. 360). Dr. Dabo's assessment of plaintiff's mood, attitude, awareness, orientation and psychomotor activity was similar to his March 2013 assessment, but he added that plaintiff exhibited moderate aggression, fair impulse and anger control and low need for immediate gratification (Tr. 360). Dr. Dabo diagnosed plaintiff with mood disorder, not otherwise specified, and panic disorder without agoraphobia (Tr. 362).[3]

---

[3]Mood disorder is defined in the DSM-IV as a "mental disorder[] whose [sic] essential feature is a disturbance of mood manifested as one or more episodes of mania, hypomania, depression, or some combination." Dorland's at 551.

Panic disorder is defined in the DSM-IV as

> an anxiety disorder characterized by recurrent panic (anxiety) attacks, episodes of intense apprehension, fear, or terror associated with somatic symptoms such as dyspnea, hyperventilation, palpitations, dizziness, vertigo, faintness, or shakiness and with psychological symptoms such as feelings of unreality (depersonalization or derealization) or fears of dying, going insane, or losing control; there is usually chronic nervousness and tension between attacks.

Dorland's at 552.

In July 2013, Dr. Dabo screened plaintiff for depression using the PHQ-9.[4] Plaintiff reported having a poor appetite or overeating, feeling bad about herself, having trouble concentrating on things, such as reading the newspaper or watching television, and either moving or speaking too slowly or being too fidgety or restless nearly every day (Tr. 357). Plaintiff reported that she had trouble falling asleep or staying asleep or that she was sleeping too much, although she also reported that she was sleeping better (Tr. 357). Plaintiff reported having little interest or pleasure in doing things, feeling down, depressed or hopeless, and feeling tired or having little energy more than half the days (Tr. 357). Plaintiff did not express any suicidal or similar ideations (Tr. 357). Dr. Dabo calculated plaintiff's PHQ-9 score at 21, a score that is indicative of severe depression (Tr. 357).

--------

[4]The PHQ-9 is a questionnaire used to assess the severity of a patient's depression. A score of 20 to 27 indicates severe depression; a score of 15 to 19 indicates moderately severe depression; a score of 10 to 14 indicates moderate depression; and a score of 5 to 9 indicates mild depression. See PHQ-9 Questionnaire for Depression Scoring and Interpretation, University of Michigan, http://www.med.umich.edu/1info/-FHP/practiceguides/depress/score.pdf (last visited Feb. 21, 2019).

Plaintiff reported that her fibromyalgia[5] symptoms had improved (Tr. 357). She felt stressed because she had broken up with her boyfriend and had no drive or motivation to do things (Tr. 357). She reported panic attacks when she was alone or ran errands unaccompanied (Tr. 357). Plaintiff told Dr. Dabo that she felt paranoid, that she felt like no one wanted to see her and that people were talking about her (Tr. 357).

In a December 13, 2013 medical source statement, Dr. Dabo opined that plaintiff's impairments affected her ability to understand, remember and carry out instructions (Tr. 354). Specifically, Dr. Dabo found that plaintiff had marked restrictions in her ability to carry out complex instructions and make judgments on complex work-related decisions, as well as moderate restrictions in her ability to understand, remember and carry out simple instructions, make judgments on simple work-related decisions and understand and remember complex instructions (Tr. 354). Dr. Dabo based these assessments on plaintiff's poor concentration, limited capacity to process complex information or instructions, chronic suicidal thoughts[6] and paranoia and noted

---

[5]Fibromyalgia refers to "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." Dorland's at 703.

[6]Dr. Dabo's treatment records are inconsistent with respect to plaintiff's suicidal ideation. In July 2013, plaintiff did
(continued...)

7

that plaintiff had a history of psychiatric hospitalization (Tr. 354).

Dr. Dabo also opined that plaintiff's impairment affected her ability to interact appropriately with supervisors, co-workers and the public, as well as to respond to changes in a routine work setting (Tr. 355). Specifically, Dr. Dabo found that plaintiff had moderate restrictions in her ability to interact appropriately with co-workers and respond appropriately to usual work situations and to changes in a routine work setting, as well as mild restrictions in her ability to interact appropriately with the public and with supervisors (Tr. 355). Dr. Dabo based these assessments on a finding that plaintiff was easily annoyed or irritated by people and did not feel comfortable around people (Tr. 355).

Finally, Dr. Dabo opined that plaintiff was unable to fully concentrate and to organize her thinking, which undermined her productivity and her ability to relate to others (Tr. 355). Dr. Dabo based this assessment on plaintiff's low cognitive

---

[6](...continued)
not express any suicidal or similar ideations (Tr. 357). However, in Dr. Dabo's December 13, 2013 medical source statement, he reported that plaintiff suffered from chronic suicidal thoughts (Tr. 354).

flexibility and her limited capacity to process and follow some instructions or information (Tr. 355).

### b. Dr. Fredelyn Engelberg Damari

Dr. Fredelyn Engelberg Damari, a consulting psychologist, evaluated plaintiff on July 2, 2013 (Tr. 343-47). Plaintiff reported to Dr. Damari that she had had a previous psychiatric evaluation at Jacobi Hospital and that she had monthly treatment sessions with Dr. Sidiki Dabo (Tr. 343). At the time of the evaluation, plaintiff was taking divalproex sodium, Cymbalta, prazosin and Xanax (Tr. 343).[7]

---

[7]Divalproex sodium, also known as valproic acid, is an anticonvulsant used to treat seizures and mania in people with bipolar disorder. Valproic Acid, MedlinePlus, https:// medlineplus.gov/druginfo/meds/a682412.html (last visited Feb. 13, 2019).

Cymbalta, the brand name for duloxetine, is a selective serotonin and norepinephrine reuptake inhibitor ("SNRI") "used to treat depression and generalized anxiety disorder . . . . [It] is also used to treat pain and tingling caused by diabetic neuropathy . . . and fibromyalgia . . . ." Duloxetine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a604030.html (last visited Feb. 13, 2019).

Prazosin is an alpha-blocker used to treat high blood pressure; it is also used to treat "sleep problems associated with post-traumatic stress disorder." Prazosin, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682245.html (last visited Feb. 14, 2019).

Xanax, a brand name for alprazolam, is a benzodiazepine
(continued...)

Plaintiff reported difficulty falling asleep, loss of appetite, "depressive symptomatology with dysphoric moods,[8] crying spells, psychomotor agitation,[9] concentration difficulties, and some social withdrawal" (Tr. 343). She also reported suffering from postpartum depression (Tr. 343). Plaintiff denied any suicidal thoughts (Tr. 343-44). Plaintiff also reported that she worried excessively, had difficulty concentrating and experienced nightmares (Tr. 344). Plaintiff also reported that she had suffered panic attacks that were so severe that she urinated on herself from anxiety (Tr. 344). Plaintiff reported that Cymbalta helped her, but that her medications affected her memory (Tr. 344).

Dr. Damari found plaintiff to be cooperative and her manner of relating, social skills and overall presentation to be adequate (Tr. 344). Her affect was very anxious and her mood

---

[7](...continued)
"used to treat anxiety disorders and panic disorder." Alprazolam, MedlinePlus, https://medlineplus.gov/druginfo/meds/a684001.html (last visited Feb. 13, 2019).

[8]Dysphoric moods are characterized by "disquiet; restlessness; malaise." Dorland's at 579.

[9]Psychomotor agitation means "excessive, purposeless cognitive and motor activity or restlessness, usually associated with a state of tension or anxiety." Dorland's at 40.

dysthymic[10] (Tr. 345). Plaintiff's attention and concentration
were impaired due to emotional distress; plaintiff was unable to
do a simple arithmetic problem and was unable to count backwards
from twenty by threes (Tr. 345). Her recent and remote memory
skills were also impaired due to emotional distress; although
plaintiff was able to repeat three out of three objects immedi-
ately, after five minutes, she could recall only one out of three
objects (Tr. 345). Plaintiff could repeat four digits forward,
but she was unable to state three digits backwards (Tr. 345).
Plaintiff's intellectual functioning was below average and her
general fund of information was limited (Tr. 345).

In her medical source statement, Dr. Damari wrote that
plaintiff

> is able to follow and understand simple directions and
> instructions. She is able to perform simple tasks
> independently. She is moderately impaired in the
> ability to maintain attention and concentration. She
> is significantly impaired in the ability to maintain a
> regular schedule. She is moderately impaired in the
> ability to learn new tasks. She is significantly
> impaired in the ability to perform complex tasks inde-
> pendently. She is able to make appropriate decisions.
> She is moderately impaired in the ability to relate
> adequately with others. She is significantly impaired
> in the ability to appropriately deal with stress.
>
> The results of the present evaluation appear to be
> consistent with psychiatric problems, and this may

---

[10]Dysthymic means "characterized by symptoms of mild
depression." Dorland's at 582.

11

significantly interfere with the claimant's ability to function on a daily basis.

(Tr. 346). Dr. Damari diagnosed plaintiff with mood disorder, anxiety disorder,[11] posttraumatic stress disorder[12] and fibromyalgia, and she recommended that plaintiff continue with psychiatric treatment (Tr. 346).

### c. Dr. Wali Mohammad

Dr. Wali Mohammad, a psychiatrist, treated plaintiff from January through November of 2015 (Tr. 464-99, 632-39).

At her initial evaluation on January 29, 2015, plaintiff reported suffering from depression, which worsened after her cousin's suicide (Tr. 485). She also reported that although she had been prescribed various antidepressants, including Cymbalta, Wellbutrin, Lexapro and Prozac,[13] she had stopped taking any

---

[11]Anxiety disorders are defined in the DSM-IV as "a group of mental disorders in which anxiety and avoidance behavior predominate." Dorland's at 547.

[12]Posttraumatic stress disorder is defined in the DSM-IV as "an anxiety disorder caused by exposure to an intensely traumatic event; characterized by reexperiencing the traumatic event in recurrent intrusive recollections, nightmares, or flashbacks, by avoidance of trauma-associated stimuli, by generalized numbing of emotional responsiveness, and by hyperalertness and difficulty in sleeping, remembering, or concentrating." Dorland's at 552.

[13]Wellbutrin is a brand name for bupropion, which is an antidepressant. Bupropion, MedlinePlus, https://medlineplus.gov/druginfo/meds/a695033.html (last visited Feb. 15, 2019).

(continued...)

psychiatric medication other than Xanax (Tr. 485). Plaintiff reported feeling anxious all the time and being easily frustrated (Tr. 485).

In his evaluation of plaintiff's mental status, Dr. Mohammad noted that plaintiff's attitude was cooperative, her speech was articulate, coherent and relevant but that her mood was anxious, irritable and depressed (Tr. 487). Plaintiff exhibited anxiety or panic, but her affect was appropriate, her psychomotor activity was normal, her thought process was intact and she experienced no hallucinations, delusions or impaired self-perception (Tr. 487). She had no suicidal or homicidal thoughts, she was oriented as to time, place and person and her memory was intact (Tr. 487). She was able to perform serial subtractions (Tr. 487). Finally, Dr. Mohammad found that plaintiff's insight was good and her judgment was fair (Tr. 487).

---

[13](...continued)
Lexapro is the brand name for escitalopram, which is a selective serotonin reuptake inhibitor ("SSRI") "used to treat depression and generalized anxiety disorder." Escitalopram, MedlinePlus, https://medlineplus.gov/druginfo/meds/a603005.html (last visited Feb. 15, 2019).

Prozac is a brand name for fluoxetine, which is also an SSRI "used to treat depression, obsessive-compulsive disorder . . . some eating disorders, and panic attacks." Fluoxetine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a689006.html (last visited Feb. 15, 2019).

Dr. Mohammad screened plaintiff using the PHQ-9, and scored plaintiff at 27, which indicated severe depression (Tr. 487).

Dr. Mohammad diagnosed plaintiff as suffering from "major depressive disorder, recurrent episode, severe degree, without mention of psychotic behavior" (Tr. 487-88). He prescribed venlafaxine[14] and directed plaintiff to follow up in two weeks (Tr. 488).

On February 26, 2015, plaintiff reported to Dr. Mohammad that she was suffering from fibromyalgia and stress related to her daughter's misbehavior (Tr. 482). The results of plaintiff's mental status evaluation were the same as on January 29, 2015, including her ability to perform serial subtractions, but Dr. Mohammad did not report that plaintiff was irritable (Tr. 482). Dr. Mohammad's diagnosis remained the same, and he directed plaintiff to follow up in one month (Tr. 483).

On April 22, 2015, plaintiff complained that she was not sleeping well and reported changes in her sleep pattern (Tr. 479). Plaintiff also reported that she did not feel motivated to do anything and sometimes was not even able to take a shower (Tr.

---

[14]Venlafaxine is an SNRI "used to treat depression." Venlafaxine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a694020.html (last visited Feb. 15, 2019).

479). She wanted to increase her medication (Tr. 479). The results of plaintiff's mental status evaluation were the same as on February 26, 2015, except that she was unable to perform serial subtractions (Tr. 479). Dr. Mohammad's diagnosis still remained the same, and he directed plaintiff to follow up in one month (Tr. 480).

On May 20, 2015, Dr. Mohammad noted that plaintiff was very depressed and cried during her appointment (Tr. 476). She reported being in pain and unable to function (Tr. 476). The results of plaintiff's mental status evaluation differed from April 22, 2015 in that she was able to perform serial subtractions, but her short term memory was impaired and her insight was limited (Tr. 476). Dr. Mohammad's diagnosis remained the same, and he again directed plaintiff to follow up in one month (Tr. 477-78).

On June 30, 2015, plaintiff had run out of medication and was suffering from withdrawal, including dizziness and a fainting sensation (Tr. 473). She reported feeling overwhelmed and having no support system (Tr. 473). Plaintiff was unable to perform serial subtractions, but her short term memory was intact and her insight was good (Tr. 473). Dr. Mohammad's diagnosis was still unchanged, but he noted that plaintiff was not fully compliant with her medication regimen and had not attended

15

follow-up appointments as instructed; he directed plaintiff to follow up in one month (Tr. 474-75).

On July 15, 2015, Dr. Mohammad completed a mental impairment questionnaire concerning plaintiff (Tr. 593-97). He noted that plaintiff suffered from major depression, recurrent type, as well as chronic pain from arthritis and fibromyalgia (Tr. 593). He opined that plaintiff's diagnoses and limitations would last at least 12 months and that plaintiff was not a malingerer; she had not been hospitalized for her symptoms (Tr. 593). Dr. Mohammad noted that plaintiff's signs and symptoms included depressed mood, persistent or generalized anxiety, irritable affect, feelings of guilt or worthlessness, difficulty thinking or concentrating, easy distractibility, poor short-term memory, recurrent panic attacks, anhedonia[15] and pervasive loss of interests, appetite disturbances and weight change, decreased energy, motor tension and psychomotor abnormalities (Tr. 594). Of those signs and symptoms, the most frequent or severe were depression, fatigue, difficulty concentrating, anhedonia, insomnia and anxiety (Tr. 595).

Dr. Mohammad noted that plaintiff had not experienced any episodes of decompensation or deterioration in a work or

---

[15]Anhedonia means a "total loss of feeling of pleasure in acts that normally give pleasure." Dorland's at 91.

16

work-like setting (Tr. 595). However, in response to a question asking him to estimate plaintiff's abilities to perform mental activities in a competitive environment on a sustained and ongoing basis, he reported that plaintiff had marked limitations with respect to her ability to: (1) understand, remember and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule and consistently be punctual; (4) sustain ordinary routine without supervision; (5) work in coordination with or near others without being distracted by them; (6) make simple work-related decisions; (7) perform at a consistent pace without rest periods of unreasonable length or frequency; (8) interact appropriately with the public; (9) ask simple questions or request assistance; (10) accept instructions and respond appropriately to criticism from supervisors; (11) maintain socially appropriate behavior; (12) adhere to basic standards of neatness; (13) respond appropriately to workplace changes; (14) be aware of hazards and take appropriate precautions; (15) travel to unfamiliar places or use public transportation; (16) set realistic goals and (17) make plans independently (Tr. 596). Dr. Mohammad also noted that plaintiff had moderate-to-marked limitations with respect to her ability to remember locations and work-like

17

procedures and understand, remember and carry out simple, one-to-two step instructions (Tr. 596).

Dr. Mohammad opined that plaintiff would be absent from work more than three times per month and that her symptoms and limitations dated as far back as June 1, 2013 (Tr. 597).

On September 12, 2015, plaintiff resumed treatment with Dr. Mohammad after she reported that she had been sick all summer (Tr. 632). Plaintiff's mental status examination was similar to her prior examinations (Tr. 632). Dr. Mohammad's diagnosis remained the same, and he directed plaintiff to follow up in one month (Tr. 633-34).

On October 8, 2015, plaintiff complained to Dr. Mohammad of stress because her father was suffering from terminal lung cancer (Tr. 635). Plaintiff's mental status examination was similar to her prior examinations (Tr. 635). Again, Dr. Mohammad's diagnosis remained the same, and he directed plaintiff to follow up in one month (Tr. 636).

On November 5, 2015, plaintiff reported that her father was staying with her and that her daughter's behavior had im-proved (Tr. 638). Plaintiff's mental status examination was similar to her prior examinations (Tr. 638). Dr. Mohammad's diagnosis remained the same, and he directed plaintiff to follow up in one month (Tr. 639).

2. Medical Records Concerning
   Plaintiff's Physical Issues

a. Dr. Marilee Mescon

Dr. Marilee Mescon, a consulting internist, examined plaintiff on July 2, 2013 (Tr. 348-51). Plaintiff complained of having generalized joint and muscle pain for the preceding two or three years (Tr. 348). Plaintiff reported experiencing sharp, aching and burning pain, which she rated at 10 out of 10, but that it eased to a 5 out of 10 with pain medication (Tr. 348). At the time of the examination, plaintiff was taking Depakote,[16] Cymbalta, prazosin and Xanax (Tr. 348).

Plaintiff reported that she was able to shower, bathe, dress, cook, clean, do her laundry and shop (Tr. 348). She spent her free time watching television, listening to the radio, reading and doing crossword puzzles (Tr. 348-49).

Upon examination, plaintiff appeared to be in no acute distress (Tr. 349). She was able to sit, stand and walk normally and without assistance, and she did not require help changing her clothes or getting on and off the exam table (Tr. 349). She exhibited a full range of motion in her musculoskeletal system,

---

[16]Depakote is a brand name for valproic acid. Valproic Acid, supra, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682412.html (last visited Feb. 14, 2019).

with no tenderness, redness, heat, swelling or effusion[17] (Tr. 350).  Dr. Mescon rated plaintiff's strength in her upper and lower extremities at a 5 out of 5 and her grip strength in both hands at a 5 out of 5 (Tr. 350).

In her medical source statement, Dr. Mescon wrote that plaintiff had "no limitations in [her] ability to sit, stand, climb, push, pull, or carry heavy objects at this time" (Tr. 350).

### b.   Montefiore Medical Center

On February 27, 2014, Dr. Irene Blanco, a rheumatologist at Montefiore Medical Center, treated plaintiff for her joint pain (Tr. 533-38).  Plaintiff reported that she had been suffering from the symptoms of fibromyalgia for more than a year-and-a-half, and that the pain in her left arm and shoulder had worsened (Tr. 533).  Plaintiff experienced pain and swelling in her hands, with a burning sensation in her arm and numbness in her fingertips (Tr. 533).  Neither Cymbalta nor over-the-counter pain medication eased the pain (Tr. 533).

Plaintiff complained to Dr. Blanco of chest pains, anxiety and depression, but she denied all other symptoms or

---

[17]Effusion refers to "the escape of fluid into a part or tissue."  Dorland's at 595.

abnormalities except as noted above (Tr. 535). She appeared to be in no acute distress, but Dr. Blanco assessed sensitivity at 14 out of 18 tender points[18] (Tr. 536).

On March 27, 2014, plaintiff returned to Dr. Blanco with continuous, diffuse body pain (Tr. 528). Plaintiff again appeared in no acute distress, but Dr. Blanco again assessed sensitivity at 14 out of 18 tender points (Tr. 530).

On May 22, 2014, plaintiff complained that her fibromyalgia was "not doing well," that she had pain in her hands and that she felt weak (Tr. 523). Despite plaintiff's subjective complaints, however, Dr. Blanco observed no acute distress and assessed sensitivity at only 4 out of 18 tender points (Tr. 525).

On December 8, 2014, Dr. John Culmine, plaintiff's primary care physician, conducted plaintiff's annual physical examination (Tr. 516-22). Dr. Culmine noted plaintiff's history of psychiatric problems and fibromyalgia (Tr. 516-17). He noted that although plaintiff did not exhibit any signs or symptoms of

---

[18]The American College of Rheumatology has specified two primary criteria that characterize fibromyalgia: (1) three or more months of widespread pain in the body and (2) pain at a minimum of 11 out of 18 specified locations throughout the body, called tender points. A doctor assesses sensitivity at each tender point by pressing on the tender point with his or her thumb. See David Sinclair, MD, et al., The Manual Tender Point Survey, National Fibromyalgia Association (Oct. 3, 2005), http://www.fmaware.org/articles/the-manual-tender-point-survey/ (last visited Mar. 4, 2019).

depression, she complained of depression and occasional headaches (Tr. 518). Plaintiff exhibited no other abnormalities, and Dr. Culmine referred her back to her treating specialists (Tr. 518-19).

On February 6, 2015, plaintiff complained to Dr. Blanco that she continued to experience back pain and that her fingers felt sprained and swollen and that her grip was affected (Tr. 511). Dr. Blanco assessed sensitivity at 18 out of 18 tender points and noted that plaintiff's hands looked puffy (Tr. 513). However, Dr. Blanco indicated that plaintiff's grip strength and sensation were normal (Tr. 513).

On July 9, 2015, plaintiff complained of pain in her scalp, shoulder and neck (Tr. 506). Dr. Blanco again assessed sensitivity at 18 out of 18 tender points, with diffuse pain and stiffness (Tr. 509). In addition to plaintiff's prescribed medication, Dr. Blanco referred plaintiff for physical therapy (Tr. 578).

On July 10, 2015, Dr. Blanco completed a fibromyalgia questionnaire concerning plaintiff (Tr. 621-25). She found that plaintiff met the American College of Rheumatology's criteria for fibromyalgia and that no diagnoses other than fibromyalgia better explained plaintiff's symptoms and limitations (Tr. 621). Plaintiff had widespread pain or a history of widespread pain in

22

all quadrants of the body that persisted for at least three months and had at least 11 positive tender points upon physical exam or digital palpation in her neck, chest, arms, hips, back and knees (Tr. 622). Dr. Blanco noted that plaintiff's pain fluctuated in intensity and was not always present, but that plaintiff experienced chronic widespread pain in her neck, chest, abdomen, upper and lower back, jaw, shoulders, arms, hips and legs (Tr. 622). In addition to plaintiff's physical pain, Dr. Blanco indicated that plaintiff suffered from difficulty thinking, depression, fatigue or tiredness, insomnia and headache (Tr. 622).

Dr. Blanco assessed that plaintiff could sit for only two hours out of an eight-hour work day, that she could stand for less than one hour and that she had to move around every two-to-three hours, returning to a sitting position after 10-20 minutes (Tr. 623). Plaintiff could only occasionally lift or carry objects weighing up to ten pounds, but she could grasp, turn and twist objects, use her hands or fingers for fine manipulations and use her arms for reaching (Tr. 623). Dr. Blanco opined that plaintiff's symptoms would worsen with the stress of a competitive work environment (Tr. 625). She assessed that plaintiff's symptoms would interfere with her concentration and attention for up to one-third of an eight-hour work day, and that plaintiff

23

would require unscheduled breaks at unpredictable intervals once or twice per day (Tr. 625). However, she estimated that plaintiff would be absent from work less than once per month (Tr. 625). Finally, Dr. Blanco opined that plaintiff's impairments would last at least 12 months and that plaintiff was not a malingerer (Tr. 621). She also noted that plaintiff's anxiety and depression exacerbated plaintiff's fibromyalgia symptoms (Tr. 621).

On July 20, 2015, Dr. Culmine completed a disability impairment questionnaire for plaintiff (Tr. 626-30). He indicated that plaintiff had been diagnosed with fibromyalgia and bipolar disorder (Tr. 626). He opined that plaintiff's impairments would last at least 12 months and that plaintiff was not a malingerer (Tr. 626). Dr. Culmine identified plaintiff's primary symptom as diffuse, daily pain, but he was unable to assess the effect of plaintiff's impairments on her ability to perform work-related activities (Tr. 627-29). He estimated that plaintiff would miss work two to three times per month and that her symptoms dated back to June 1, 2013 (Tr. 630).

## c. Dr. Douglas Greenfield

Dr. Douglas Greenfield, a consulting internist and cardiologist, examined plaintiff on January 25, 2016 (Tr. 700-

03). Plaintiff complained of suffering from fibromyalgia for several years preceding the examination, as well as depression, bipolar disorder, anxiety, panic attacks and posttraumatic stress disorder (Tr. 700). Plaintiff reported extreme sensitivity to touch, difficulty holding and lifting objects and poor sleep and memory (Tr. 700). At the time of the examination, plaintiff was taking venlafaxine, alprazolam and bupropion (Tr. 700).

Plaintiff reported that she was able to shower and dress, but that "she [did] not do the cooking, cleaning, laundry and shopping as her parents [were] . . . staying with her" (Tr. 701). She spent her free time watching television, listening to the radio and socializing (Tr. 701).

Upon examination, plaintiff appeared to be in no acute distress (Tr. 701). She was able to sit, stand and walk normally, and she did not require help changing her clothes or getting on and off the exam table (Tr. 701). She exhibited a full range of motion in her musculoskeletal system, with no redness, heat, swelling or effusion (Tr. 702). Dr. Greenfield assessed sensitivity at five out of 18 tender points (Tr. 702). He rated plaintiff's strength in her upper and lower extremities at a 5 out of 5 and her grip strength in both hands at a 5 out of 5 (Tr. 702).

In his medical source statement, Dr. Greenfield wrote that plaintiff had no limitations (Tr. 703).

### D.  Proceedings Before the ALJ

Plaintiff first appeared before the ALJ on July 21, 2015 (Tr. 704-32).  The hearing was continued to and concluded on November 24, 2015 (Tr. 44-102).

#### 1.  Plaintiff's Testimony

Plaintiff testified that she last worked in 2011 as a bartender and an assistant in a hair salon (Tr. 708-10).  She earned $35 plus tips for each bartending shift (Tr. 710).  Plaintiff was unable to state with certainty how much she earned per night or per month (Tr. 710-13).  When the ALJ asked plaintiff why her doctor's notes from December 8, 2014 indicated that she worked as a hairdresser, plaintiff testified that she had not worked since filing her disability application on March 22, 2013 (Tr. 718-21).

Plaintiff testified that at the time of the hearing, she was taking several medications, including Xanax for anxiety, two different anti-depressants and steroids (Tr. 715-17).  She had recently stopped taking Gabapentin for her fibromyalgia and stated that although her doctor had prescribed Lyrica in substi-

26

tution for Gabapentin, she had not yet filled the prescription (Tr. 717). She believed her medications caused her to have memory problems (Tr. 718).

Plaintiff testified that Dr. Culmine, her primary care doctor, had prescribed psychiatric medication during gaps in her psychiatric treatment (Tr. 723-25). She also testified that she had been hospitalized for depression in 2005 (Tr. 726).

Plaintiff testified that she did not really read but that she did watch television (Tr. 727). She stated that she formerly did crossword puzzles but no longer did them (Tr. 727-28).

Plaintiff stated that she had gained 20 pounds or more in a year (Tr. 728-29). She also stated that she experienced anxiety in dealing with crowded places, specifically supermarkets, trains and elevators (Tr. 729). She testified that she suffered from daily anxiety attacks (Tr. 729-30).

When the hearing resumed on November 24, 2015, plaintiff testified that she had been very sick over the summer and had been hospitalized for legionnaires' disease,[19] shingles[20] and

---

[19]Legionnaires' disease is "an acute, sometimes fatal, bacterial disease caused by infection with Legionella pneumophila, not spread by person-to-person contact; it is characterized by pneumonia, high fever, gastrointestinal pain, headache, and sometimes involvement of the kidneys, liver, or
(continued...)

27

an unspecified stomach ailment (Tr. 45-46). She testified that
she had resumed treatment with Dr. Mohammad and Dr. Blanco (Tr.
48-49). She complained of side effects from her medications, but
was unable to remember clearly if or when she had discontinued
their use and changed medications (Tr. 50-52). She did state
that she continued to take medication for depression and anxiety,
but that she had not yet found a satisfactory medication for her
fibromyalgia (Tr. 54). Plaintiff testified that she was in
constant pain and that her inability to treat the pain or to
contact her doctors exacerbated her anxiety (Tr. 63-64).

    She testified that some days she was unable to walk or
move her feet because of the pain (Tr. 67-68). On days when her
pain was less severe, she would be able to walk a short distance,
but then she would have to sit down and rest (Tr. 71-73). She

---

[19](...continued)
nervous system."  Dorland's at 537.

[20]Shingles is another name for herpes zoster,

> an acute, infectious, usually self-limited disease . .
> . [that] is characterized by severe neuralgic pain
> along the distribution of the affected nerve with crops
> of clustered vesicles over the area of the
> corresponding dermatome; it is usually unilateral and
> confined to one dermatome or adjacent ones.
> Postherpetic neuralgia may be a complication.   In
> immunocompromised patients it may disseminate and be
> fatal.

Dorland's at 852, 1703.

28

could not carry heavy or bulky objects, and her hands would cramp up, affecting her grip and her handwriting (Tr. 74-78).

With respect to her psychiatric symptoms, plaintiff testified that she suffered from crying spells, panic attacks, persistent anxiety and depression (Tr. 78-81). She stated that she was unable to concentrate and had to make lists for even basic tasks (Tr. 82).

Finally, plaintiff testified that she was able to shop for groceries, clean and do laundry, but only with the assistance of her boyfriend or her daughter (Tr. 92-94). She watched television, but she was unable to read or do crossword puzzles because of her inability to concentrate (Tr. 94-95).

### 2. Vocational Expert Testimony

Vocational expert Esperanza DiStefano ("VE DiStefano") testified at the July 21, 2015 hearing (Tr. 713-715). VE Distefano characterized plaintiff's past work as a waitress, which is defined in the United States Department of Labor's Dictionary of Occupational Titles ("DOT") as DOT Code 311.477-030, which is light-exertion, semi-skilled work (Tr. 713-14). She also identified plaintiff's work as a bartender as DOT Code 312.474-010, which is light-exertion, semi-skilled work (Tr. 714). At the request of plaintiff's counsel and the ALJ, she

also identified plaintiff's past work as a hairdresser as DOT Code 332.271-018, which is light-exertion, skilled work (Tr. 714-15).

Vocational expert Dr. Yaakov Taitz[21] ("VE Taitz") testified at the November 24, 2015 hearing (Tr. 96-100). The ALJ asked VE Taitz to consider possible jobs for a hypothetical person of plaintiff's age, education and experience, with the ability to meet the exertional demands of sedentary work,[22] who needed to shift from sitting to standing every 45 minutes, could climb ramps and stairs, stoop, kneel, crouch and crawl only occasionally and could not perform assembly line work (Tr. 96-97). VE Taitz testified that such a hypothetical individual could not perform any of plaintiff's past work because all of plaintiff's past work required light exertion (Tr. 97).

---

[21]The hearing transcript from November 24, 2015 refers to the vocational expert as "Dr. Tates" (Tr. 95-100) but the resumé contained in the record spells the witness's name "Taitz" (Tr. 307-08).

[22]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary . . . ." 20 C.F.R. C.F.R. § 416.967(a).

VE Taitz testified that such an individual could, however, work as an addresser,[23] DOT Code 209.587-010, with 300,000 jobs nationally, a document preparer, DOT Code 249.587-018, with 160,000 jobs nationally, and a surveillance system monitor, DOT Code 379.367-010, with 80,000 jobs nationally (Tr. 57). When the ALJ asked VE Taitz to limit the hypothetical individual to an individual who could only occasionally handle things with her dominant hand, he opined that such an individual would not be able to work as a document preparer (Tr. 97-98). VE Taitz testified that such an individual could, however, work as a telephone solicitor, DOT Code 299.357-014, with 250,000 jobs nationally, and an order clerk, DOT Code 209.567-014, with 70,000 jobs nationally (Tr. 98).

In response to questioning by plaintiff's counsel and the ALJ, VE Taitz testified that a hypothetical individual who is limited to simple routine or repetitive tasks would not be able to maintain employment if she had more than one unscheduled absence per month (Tr. 99).

---

[23]According to the hearing transcript, VE Taitz did not provide a job title for DOT Code 209.587-010. DOT Code 209.587-010 refers to an "addresser."

III.  Analysis

    A.  Applicable Legal
        Principles

        1.  Standard of Review

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); Lockwood v. Comm'r of Soc. Sec. Admin., --- F.3d --- , 2019 WL 366695 at *3 (2d Cir. Jan. 23, 2019); Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2014) (per curiam); Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Burgess v. Astrue, 437 F.3d 117, 127 (2d Cir. 2008).  Moreover, the court cannot "affirm an administrative action on grounds different from those considered by the agency."  Lesterhuis v. Colvin, 805 F.3d 83, 86 (2d Cir. 2015), quoting Burgess v. Astrue, supra, 537 F.3d at 128.

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.  Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's

decision." Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.). However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Selian v. Astrue, supra, 708 F.3d at 417 (citation omitted).

## 2. Determination
of Disability

A claimant is entitled to SSI if the claimant can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."[24] 42 U.S.C. § 423(d)(1)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to work must last twelve months). The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be "of such severity" that the claimant cannot perform her previous work and "cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Whether such work is actually available in the area where the claimant resides is immaterial. 42 U.S.C. § 423(d)(2)(A).

---

[24]The standards that must be met to receive SSI benefits under Title XVI of the Act are the same as the standards that must be met in order to receive disability insurance benefits under Title II of the Act. Barnhart v. Thomas, 540 U.S. 20, 24 (2003). Accordingly, cases addressing the former are equally applicable to cases involving the latter.

In making the disability determination, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (internal quotation marks omitted).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations. 20 C.F.R. § 416.920(a)(4)(i)-(v); see Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at 151. The first step is a determination of whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If she is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 416.920(a)(4)(ii). If she does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can

still perform her past relevant work given her RFC.  20 C.F.R. §
416.920(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-
25.  If she cannot, then the fifth step requires assessment of
whether, given the claimant's RFC, she can make an adjustment to
other work.  20 C.F.R. § 416.920(a)(4)(iv).  If she cannot, she
will be found disabled.  20 C.F.R. § 416.920(a)(4)(v).

        RFC is defined in the applicable regulations as "the
most [the claimant] can still do despite [her] limitations."
20 C.F.R. § 416.945(a)(1).  To determine RFC, the ALJ "identi-
f[ies] the individual's functional limitations or restrictions
and assess[es] his or her work-related abilities on a function-
by-function basis, including the functions in paragraphs (b),(c),
and (d) of [20 C.F.R. § 416.945]."  Cichocki v. Astrue, 729 F.3d
172, 176 (2d Cir. 2013) (per curiam), quoting Social Security
Ruling ("SSR") 96-8p, 1996 WL 374184 at *1 (July 2, 1996).  The
results of this assessment determine the claimant's ability to
perform the exertional demands of sustained work which may be
categorized as sedentary, light, medium, heavy or very heavy.[25]
20 C.F.R. § 416.967; see Schaal v. Apfel, 134 F.3d 496, 501 n.6
(2d Cir. 1998).  This ability may then be found to be limited

_____

        [25]Exertional limitations are those which "affect [plain-
tiff's] ability to meet the strength demands of jobs (sitting,
standing, walking, lifting, carrying, pushing, and pulling)."  20
C.F.R. § 416.969a(b).

further by nonexertional factors that restrict a claimant's ability to work.[26]  See Michaels v. Colvin, 621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than her past work.  Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005).

When the ALJ finds that the nonexertional limitations significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which the claimant can obtain and perform."  Butts v.

---

[26]Nonexertional limitations are those which "affect only [plaintiff's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching.  20 C.F.R. § 416.969a(c).

Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks and citation omitted); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").  An ALJ may rely on a vocational expert's testimony in response to a hypothetical if there is "substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion."  Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983); accord Snyder v. Colvin, 667 F. App'x  319, 321 (2d Cir. 2016) (summary order) ("When the hypothetical posed to the vocational expert is based on a residual functional capacity finding that is supported by substantial evidence, the hypothetical is proper and the ALJ is entitled to rely on the vocational expert's testimony."); Rivera v. Colvin, 11 Civ. 7469 (LTS)(DF), 2014 WL 3732317 at *40 (S.D.N.Y. July 28, 2014) (Swain, D.J.) ("Provided that the characteristics described in the hypothetical question accurately reflect the limitations and capabilities of the claimant and are based on substantial evidence in the record, the ALJ may then rely on the vocational expert's testimony regarding jobs that could be performed by a person with those characteristics.").

B.  The ALJ's Decision

The ALJ applied the five-step analysis described above and determined that plaintiff was not disabled (Tr. 19-41).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the application date of May 16, 2013 (Tr. 24). He noted that although plaintiff worked after that date, her work "did not rise to the level of substantial gainful activity" (Tr. 24).

At step two, the ALJ found that plaintiff suffered from the following severe impairments: "fibromyalgia, obesity, a mood disorder, anxiety and depression" (Tr. 24).

At step three, the ALJ found that plaintiff's mental impairment did not meet the criteria of listing 12.04, 20 CFR, Part 404, Subpart P, Appendix 1 (Tr. 25). In reaching his conclusion, the ALJ stated that he considered whether the paragraph B criteria were satisfied and concluded that, because plaintiff's mental impairment did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, the paragraph B criteria were not satisfied (Tr. 25). Specifically, the ALJ found that plaintiff was mildly restricted in the activities of daily living, moderately re-stricted in social functioning, moderately restricted with

respect to concentration, persistence or pace and that she had not experienced any episodes of decompensation (Tr. 25). The ALJ also stated that he considered whether the paragraph C criteria were satisfied and concluded that they were not, without further elaboration (Tr. 25).

The ALJ then determined that plaintiff retained the RFC to perform sedentary work, with the limitations that she needed to alternate positions as frequently as every 45 minutes and could climb ramps and stairs, stoop, kneel, crouch and crawl only occasionally (Tr. 26). Plaintiff could use her hands for fine manipulation frequently, but she could not work on an assembly line and was limited to unskilled work -- repetitive, routine and simple tasks (Tr. 26). Finally, plaintiff could only have occasional contact with the public (Tr. 26). To reach his RFC determination, the ALJ examined the opinions of the treating and consulting physicians and determined the weight to be given to each opinion based on the objective medical record, including the treatment notes of plaintiff's treating physicians (Tr. 26-33). The ALJ also considered plaintiff's testimony and found that while plaintiff's medically determinable impairments could reasonably have caused her alleged symptoms, a review of the entire case record showed that plaintiff's statements regarding

their intensity, persistence and limiting effects were not entirely credible (Tr. 26).

The ALJ first addressed plaintiff's physical impairments: fibromyalgia and obesity (Tr. 26-30). The ALJ concluded that plaintiff's fibromyalgia would not foreclose her ability to work at a job that involved a narrowed range of sedentary exertion (Tr. 26). The ALJ noted that, although plaintiff's fibromyalgia was documented by a rheumatologist, the record revealed few consistently significant clinical signs (Tr. 26). Plaintiff tested positive at 18 out of 18 tender points at only two examinations, in February and July of 2015, which coincided with a period of time in which she was not taking her medication as prescribed (Tr. 26-27). Similarly, when plaintiff tested positive at 14 out of 18 tender points at a February 2014 examination, she was also not taking her medication as prescribed (Tr. 26-27).

The ALJ gave "significant weight" to some aspects of the opinion of Dr. Blanco, plaintiff's treating rheumatologist (Tr. 29). Specifically, the ALJ credited Dr. Blanco's opinion that plaintiff would need to alternate positions, was restricted to lifting and carrying 10 pounds occasionally and that her attention and concentration would occasionally be interrupted by her pain and fatigue (Tr. 29). The ALJ also credited Dr.

Blanco's opinion that plaintiff would miss work less than once per month over Dr. Culmine's contrary opinion that she would miss two-to-three days per month (Tr. 29). Finally, the ALJ gave "significant weight" to Dr. Blanco's opinion that plaintiff could use her hands frequently for fine manipulations, because the treatment records consistently indicated plaintiff had intact sensation and normal grip strength and range of motion (Tr. 29). However, the ALJ declined to give "much weight" to Dr. Blanco's opinion concerning plaintiff's ability to sit, stand and walk in an eight-hour day, because he found Dr. Blanco's opinions with respect to plaintiff's limitations to be internally inconsistent and unsupported by any references in any of the treatment records that plaintiff had difficulty sitting (Tr. 29).

The ALJ did not give "much weight" to the opinions of the two consultative physical examiners, who stated that plaintiff had no physical limitations, because the record showed that plaintiff suffered from fibromyalgia and had been acutely symptomatic at times (Tr. 30).

With respect to plaintiff's obesity, the ALJ concluded that it would not impose physical restrictions beyond those he had previously identified (Tr. 30).

The ALJ then addressed plaintiff's mental impairments: depression and anxiety (Tr. 30-33). The ALJ stated, without

further elaboration and without referring to specific evidence in the record, that plaintiff's mental impairments "could -- or not -- be considered a component of the fibromyalgia" (Tr. 30). The ALJ concluded that despite her mental impairments, plaintiff was able to do unskilled work as long as she had only occasional contact with the public and did not work on an assembly line (Tr. 30).

The ALJ gave "only some weight" to Dr. Dabo's December 2013 opinion concerning plaintiff's limitations (Tr. 31). The ALJ based this aspect of his decision on the absence of any reference to either suicidal thinking or paranoia in Dr. Dabo's treatment records and the lack of support, other than plaintiff's anxiety, for Dr. Dabo's conclusion that plaintiff was moderately limited in interacting appropriately with co-workers and responding to work situations (Tr. 31). The ALJ noted that plaintiff stated that she had no difficulty getting along with family, friends, neighbors, supervisors or others in authority but did not like to be around too many people (Tr. 31).

The ALJ also gave "very little weight" to Dr. Mohammad's 2015 opinion concerning plaintiff's limitations (Tr. 32). The ALJ based this aspect of his decision on the fact that Dr. Mohammad's treatment records did not note any instances of psychomotor abnormalities, motor tension, an abnormal affect,

43

appetite disturbances and poor memory -- which the ALJ character-
ized as "the basis for the limitations" (Tr. 32). The ALJ found
that plaintiff's "affect, memory, psychomotor functioning and
attention and concentration were far more frequently [normal]
than not" during her sessions with Dr. Mohammad, and, thus, he
found it "difficult, if not impossible," to reconcile the find-
ings in Dr. Mohammad's treatment notes with his assessment in
July 2015 (Tr. 32).

Finally, although the ALJ did not assign a particular
weight to the opinion of Dr. Damari, the consultative psycholo-
gist, he concluded that her opinion that plaintiff's psychiatric
problems might significantly interfere with her ability to
function on a daily basis was applicable only to 2013, the time
when Dr. Damari evaluated plaintiff (Tr. 33). The ALJ then
compared Dr. Damari's opinion from 2013 to Dr. Mohammad's treat-
ment notes from 2015 and described the latter as "giv[ing] every
indication that [plaintiff] had improved" (Tr. 33).

At step four, the ALJ concluded that, because plaintiff
was limited to sedentary work, she was unable to perform her past
work as a waitress, bartender or hairdresser, all of which
required light exertion (Tr. 33).

At step five, relying on the testimony of the VE, the
ALJ found that jobs existed in significant numbers in the na-

44

tional economy that plaintiff could perform, given her RFC, age, education and work experience, namely an addresser, document preparer and surveillance system monitor (Tr. 34). Concluding that the expert's testimony was consistent with information in the DOT, the ALJ determined plaintiff could perform those occupations and, accordingly, was not disabled (Tr. 34-35).

## C. Analysis of the ALJ's Decision

Plaintiff attacks the ALJ's disability determination on two grounds: (1) the ALJ failed to weigh the medical opinion evidence properly, and, therefore, the ALJ's determination of plaintiff's RFC was incorrect and (2) the ALJ failed to evaluate plaintiff's credibility properly (Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, dated Feb. 16, 2018 (D.I. 13) ("Pl. Mem.") at 12-25). The Commissioner contends that the ALJ's assessment of the medical evidence and plaintiff's credibility was correct (Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings, dated May 17, 2018 (D.I. 17) ("Def. Mem.") at 14-25).

After reviewing the entire record, I find that the ALJ afforded too little weight to the opinions of plaintiff's treat-

ing psychiatrists and failed to incorporate those opinions into his RFC determination, requiring remand for further proceedings. I also find that the ALJ failed to develop the record sufficiently with respect to Dr. Blanco's opinion.[27]

### 1. Treating Physician Rule

An ALJ must afford deference to the opinions of a claimant's treating physicians. A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 416.927(c)(2);[28] see also Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. §

---

[27]Because several errors by the ALJ require remand, I do not reach the issue of whether the ALJ properly evaluated plaintiff's credibility.

[28]The SSA has adopted regulations that alter the standards applicable to the review of medical opinion evidence with respect to claims filed on or after March 27, 2017. See 20 C.F.R. § 416.920c. Because plaintiff's claim was filed before that date, those regulations do not apply here.

46

416.927(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.). The Second Circuit "'do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion.'" Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (summary order), quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); accord Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015). If the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see also Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order); Petrie v. Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors. These factors include: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of

47

specialization in the area and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(2)-(6); Schisler v. Sullivan, supra, 3 F.3d at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.); Matovic v. Chater, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12, 1996) (McKenna, D.J.). Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor. Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order).

### 2. ALJ's Duty to Develop the Record

"It is the rule in [the Second] [C]ircuit that 'the ALJ, unlike a judge in a trial, must [him]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996), quoting Echeverria v. Sec'y of Health & Human Servs., 785 F.2d 751, 755 (2d Cir. 1982); Perez v. Chater, supra, 77 F.3d at 47 ("We have stated many times that the ALJ generally has an affirmative obligation to develop the administrative record . . . ." (internal quotation marks omitted)); Jackson v. Colvin, 13 Civ. 5655 (AJN)(SN), 2014 WL 4695080 at *15 (S.D.N.Y.

Sept. 3, 2014) (Nathan, D.J.) ("Due to the non-adversarial nature of the social security proceedings, a full hearing requires the ALJ to affirmatively develop the record." (internal quotations and citation omitted)).[29] The ALJ's duty to develop the record exists irrespective of whether claimant is represented by counsel. Shaw v. Chater, supra, 221 F.2d at 131 (2d Cir. 2000); Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. § 416.912(d).

The ALJ is required "affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." Eusepi v. Colvin, 595 F. App'x 7, 9 (2d Cir. 2014) (summary order), quoting Rosa v. Callahan, 168 F.3d 72, 79 & n.5 (2d Cir. 1999); accord Swiantek v. Comm'r of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (summary order). "[T]he current amended regulations . . . give an ALJ more discretion to 'determine the best way to resolve the inconsistency or insufficiency' based on the facts of the case . . . ." Rolon v. Comm'r of Soc. Sec., 994 F. Supp. 2d 496, 505 (S.D.N.Y. 2014) (Nathan, D.J.), quoting 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1) (2013). However, the regulations continue to "contemplate the

---

[29]On March 27, 2017, the ALJ's duty to develop the record was recodified from Section 416.912(d) to Section 416.912(b) without any substantive changes.

ALJ recontacting treating physicians when 'the additional infor-

mation needed is directly related to that source's medical

opinion.'" Jimenez v. Astrue, 12 Civ. 3477 (GWG), 2013 WL

4400533 at *11 (S.D.N.Y. Aug. 14, 2013) (Gorenstein, M.J.),

quoting How We Collect and Consider Evidence of Disability,

supra, 77 Fed. Reg. at 10,652.

> "[I]f a physician's finding in a report is believed to
> be insufficiently explained, lacking in support, or
> inconsistent with the physician's other reports, the
> ALJ must seek clarification and additional information
> from the physician." Calzada v. Ast[rue], 753 F. Supp.
> 2d 250, 269 (S.D.N.Y. 2010); see also Rosa, 168 F.3d at
> 79 (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir.
> 1996)). The rationale behind this rule is that "a
> treating physician's 'failure to include this type of
> support for the findings in his report does not mean
> that such support does not exist; he might not have
> provided this information in the report because he did
> not know that the ALJ would consider it critical to the
> disposition of the case.'" Rosa, 168 F.3d at 80 (quot-
> ing Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d
> Cir. 1998)).

Geronimo v. Colvin, 13 Civ. 8263 (ALC), 2015 WL 736150 at *5

(S.D.N.Y. Feb. 20, 2015) (A. Carter, D.J.).

### 3. Plaintiff's Mental Impairments

The ALJ discounted Dr. Mohammad's opinion that plain-

tiff had marked limitations in her ability to concentrate and

persist, marked limitations in her social abilities and would be

absent from work more than three times per month, finding that it

50

was contradicted by Dr. Mohammad's own treatment records. Specifically, the ALJ cited the absence of any instances of psychomotor abnormalities, motor tension, abnormal affect, appetite disturbances or poor memory in Dr. Mohammad's treatment records (Tr. 32). However, in the mental impairment question-naire Dr. Mohammad prepared for plaintiff, he identified depres-sion, fatigue, difficulty concentrating, anhedonia, insomnia and anxiety as the signs and symptoms that were the most frequent or severe (Tr. 595). These signs and symptoms appear frequently and fairly consistently in the treatment records. By ignoring the consistent appearance of plaintiff's most frequent and severe signs and symptoms in the treatment records and by focusing on the absence of other signs and symptoms, the ALJ overstated the degree to which Dr. Mohammad's opinion is inconsistent with his treatment records. Thus, the ALJ failed to give adequate reasons for declining to afford controlling or significant weight to Dr. Mohammad's opinion.

Furthermore, Dr. Mohammad's opinion with respect to plaintiff's mental impairments is consistent with the earlier opinions of Dr. Dabo and Dr. Damari. In his 2013 medical source statement, Dr. Dabo opined that plaintiff suffered mild, moderate or marked restrictions across a spectrum of work-related mental activities (Tr. 354-55). In her 2013 evaluation, Dr. Damari

opined that plaintiff's psychiatric problems might "significantly interfere with [her] ability to function on a daily basis" (Tr. 346). Contrary to the ALJ's assessment of longitudinal improvement in plaintiff's mental health, Dr. Mohammad's well-supported opinion suggests -- at best -- that plaintiff's mental impairments persisted well into 2015.

Finally, because the ALJ did not properly weigh the opinions of plaintiff's treating psychiatrists, he failed to question the VE appropriately with respect to plaintiff's mental impairments. Although the ALJ limited the hypothetical claimant to unskilled work involving simple, repetitive tasks, the only other mental limitation the ALJ asked the VE to assume related to an acceptable number of unscheduled absences. To the extent that plaintiff's mental impairments would interfere with her ability to maintain a regular work schedule or to concentrate while at work, as the psychiatrists opined they would, the ALJ did not sufficiently explore these limitations with the VE in calculating plaintiff's RFC.

### 4. Plaintiff's Physical Impairments

Plaintiff argues correctly that the ALJ failed to develop the record sufficiently with respect to Dr. Blanco's opinion concerning plaintiff's ability to sit, stand and walk in

an eight-hour work day (Pl. Mem. at 19-20). The ALJ found Dr.
Blanco's opinion that plaintiff was limited to sitting for two
hours and standing and walking for less than an hour to be
inconsistent with her opinion that plaintiff would need to get up
from a seated position every two-to-three hours, move around for
10-20 minutes and then resume sitting (Tr. 29). This inconsis-
tency is attributable to the way the questions in the
fibromyalgia questionnaire are phrased (Tr. 623). Question 9
asks the physician, "Considering your patient's conditions,
estimate your patient's ability to perform work in a competitive
environment on a sustained and ongoing basis (8 hours per day, 5
days per week)." (Tr. 623). Sub-questions a and b ask the
physician to circle the number of hours the patient can perform a
job in a seated position and standing and/or walking, respec-
tively; the answer choices are "<1, 1, 2, 3, 4, 5, 6+" (Tr. 623).
Dr. Blanco circled 2 in response to question 9a and less than 1
in response to question 9b (Tr. 623). Question 10a asks, "Is it
medically necessary for your patient to avoid continuous sitting
in an 8-hour workday?" (Tr. 623). Dr. Blanco answered yes to
this question (Tr. 623). Question 10b asks, "If yes, how fre-
quently must your patient get up from a seated position to move
around?" (Tr. 623). Dr. Blanco answered "every 2-3 h or so" to
this question (Tr. 623). Question 10c asks, "How long before

your patient can return to a seated position?" (Tr. 623). Dr. Blanco answered "10-20 minutes" in response to this question (Tr. 623). Thus, Dr. Blanco's answer to question 9a, that plaintiff could only perform a job in a seated position for two hours, appears inconsistent with her answers to questions 10a, 10b and 10c, where she indicated that plaintiff would need to avoid continuous sitting but could sit for two-to-three hours, move around for 10 to 20 minutes and then return to a seated position (Tr. 623).

However, identifying this inconsistency in the opinion evidence triggered the ALJ's duty to clarify whether Dr. Blanco meant that plaintiff could only work in a seated position for a total of two hours per day, or, as Dr. Blanco's responses to subsequent questions suggest, that plaintiff could only work in a seated position for two hours at a time, with breaks in between two-hour seated stints. The record contains no evidence that the ALJ attempted to resolve this inconsistency in Dr. Blanco's opinion. Upon remand, the ALJ should contact Dr. Blanco to clarify the meaning of her opinion.

Beyond the ALJ's failure to develop the record suffi-ciently, however, plaintiff's argument that the ALJ erred in his treatment of Dr. Blanco's opinion is unpersuasive. As the ALJ stated, he largely credited Dr. Blanco's assessment of the

54

limitations imposed by plaintiff's fibromyalgia, including her estimate that plaintiff would rarely miss work (Tr. 29). Furthermore, the ALJ dismissed the opinions of the consultative physicians, who opined that plaintiff had no physical limitations whatsoever, and found ample support in the record for the limitations imposed by plaintiff's fibromyalgia (Tr. 30). As the ALJ correctly stated, the record contains no references to any difficulty with sitting, standing or walking. Plaintiff's testimony corroborates this assessment; she testified that she was able to walk most days, albeit with some limitations. Finally, the ALJ's hypothetical to the VE proposed more restrictive conditions -- only 45 minutes of continuous seated work before shifting positions -- than those suggested by the opinion evidence. The ALJ's RFC finding with respect to plaintiff's physical impairments was, therefore, supported by substantial evidence.

Plaintiff's claim that the ALJ erred by basing plaintiff's physical RFC on a composite of the medical opinions in the record is unpersuasive. The ALJ's statement that plaintiff's RFC "'lies somewhere in between'" the opinions of Dr. Blanco and the consultative physicians (Pl. Mem. at 21), although inelegantly worded, does not mean that the ALJ arbitrarily picked a point on a spectrum between these opinions. As described above, the ALJ's

assessment of plaintiff's physical RFC was largely based on the opinion of Dr. Blanco, plaintiff's treating physician, which was well supported in the record.

In conclusion, because (1) the ALJ erred with respect to plaintiff's mental impairments by affording too little weight to the opinions of plaintiff's treating psychiatrists and failing to incorporate those opinions into his RFC determination and (2) the ALJ failed to develop the record fully with respect to the putative inconsistency in Dr. Blanco's opinion, remand is required.

D.  Appointments Clause
    Challenge

Article II, Section 2, Clause 2 of the Constitution provides, in pertinent part, that only the President, "Courts of Law," or "Heads of Departments," can appoint "Officers" of the United States.  Actions taken by an "Officer" of the United States who was not appointed in accordance with the Constitution appear to have no legal effect.  See Lucia v. SEC, --- U.S. ---, 138 S. Ct. 2044, 2055 (2018).  Relying on Lucia, plaintiff also claims that the ALJ "was not constitutionally appointed at the time of the decision in this case" and, therefore, lacked the power to decide her claim (Letter, dated Sept. 13, 2018 (D.I.

19)). The Commissioner opposes plaintiff's Appointments Clause challenge on the ground that plaintiff waived any such challenge "by failing to raise it at any point in the administrative process" (Letter, dated Oct. 12, 2018 (D.I. 22)).

A plaintiff "'who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case' is entitled to relief." Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018), quoting Ryder v. United States, 515 U.S. 177, 182-183 (1995) (emphasis added). In the context of Social Security proceedings, the overwhelming majority of district courts have held that Lucia requires challenges under the Appointments Clause to be raised during the administrative proceedings; courts have found that a plaintiff's failure to do so operates as a waiver. See, e.g., Kimberly B. v. Berryhill, 17-cv-5211 (HB), 2019 WL 652418 at *14-*15 (D. Minn. Feb. 15, 2019); Michelle Alicia S. v. Berryhill, EDCV 17-2115-JPR, 2019 WL 631913 at *3 n.6 (C.D. Cal. Feb. 14, 2019); Axley v. Comm'r, Soc. Sec. Admin., 18-cv-1106-STA-cgc, 2019 WL 489998 at *1-*2 (W.D. Tenn. Feb. 7, 2019); Shipman v. Berryhill, 17-cv-00309-MR, 2019 WL 281313 at *3 (W.D.N.C. Jan. 22, 2019); Dierker v. Berryhill, 18cv145-CAB(MSB), 2019 WL 246429 at *2-*4 (S.D. Cal. Jan. 16, 2019) (Report & Recommendation), adopted at 2019 WL 446231 at *1 (S.D. Cal. Feb. 5, 2019); A.T. v. Berryhill, 17-4110-JWB, 2019 WL

184103 at *7 (D. Kan. Jan. 14, 2019); <u>Stearns v. Berryhill</u>, 17-CV-2031-LTS, 2018 WL 4380984 at *6 (N.D. Iowa Sept. 14, 2018).

Plaintiff concedes that her Appointments Clause challenge was not raised before the ALJ or the Appeals Council (Letter, dated Sept. 13, 2018 (D.I. 19)). Plaintiff's challenge to the constitutionality of the ALJ's appointment is, therefore, denied as untimely.

IV. <u>Conclusion</u>

Accordingly, for all the foregoing reasons, plaintiff's motion for judgment on the pleadings is granted, and the Commissioner's motion for judgment on the pleadings is denied. The case is remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of the Court is respectfully requested to mark this matter closed.

Dated:    New York, New York
          March 20, 2019

                          SO ORDERED

                          _____
                          HENRY PITMAN
                          United States Magistrate Judge

Copies transmitted to:

All Counsel